NORA J CHOROVER (Bar No. 547352)
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Fl.
Boston, MA  02114
Phone: 617-742-5800
Fax:    617-742-5858

Attorneys for Plaintiff
CLEAN WATER ACTION

Filed Electronically 11/4/2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CLEAN WATER ACTION,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>RICHLINE GROUP, INC., d/b/a LEACHGARNER, a Berkshire Hathaway Company,<br><br>　　　　　　　Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Clean Water Act,<br>33 U.S.C. §§ 1251 to 1387) |

CLEAN WATER ACTION ("CWA") by and through its counsel, hereby alleges:

**INTRODUCTION**

1.　　This is a civil suit brought under the citizen suit enforcement provisions of the Clean Water Act, 33 U.S.C. § 1251, et seq. (the "Clean Water Act" or "the Act").  Plaintiff seeks declaratory judgment, injunctive relief, and other relief the Court deems appropriate with regard to actions taken by Richline Group, Inc., d/b/a LeachGarner, a Berkshire Hathaway Company ("Defendant" or "LeachGarner") which resulted in the unlawful discharge of stormwater runoff from the LeachGarner facilities, located at 49 Pearl Street and 200 East Street in Attleboro, Massachusetts (the "Facilities").

2.     Activities that take place at industrial facilities, such as material handling and storage, are often exposed to the weather.  As runoff from rain or snow melt comes into contact with these materials, it picks up pollutants and transports them to nearby storm sewer systems, rivers, lakes, or coastal waters.  Stormwater pollution is a significant source of water quality problems for the nation's waters.  The Massachusetts Department of Environmental Protection has determined that stormwater runoff represents the single largest source responsible for water quality impairments in the Commonwealth's rivers, lakes, ponds, and marine waters.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

4.     On July 24, 2013, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("DEP"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

5.     More than sixty days have passed since notice was served on Defendant and the state and Federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the Commonwealth of Massachusetts has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

6.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

7. Plaintiff CLEAN WATER ACTION ("CWA") is a nationwide non-profit public benefit corporation organized under the laws of the District of Columbia, with its principal office located in Boston, Massachusetts. CWA has approximately 50,000 members who live, recreate and work in and around waters of the Commonwealth of Massachusetts, including Speedway Brook and Ten Mile River. CWA is dedicated to working for clean, safe and affordable water, protection of natural resources, the prevention of health-threatening pollution, the creation of environmentally safe jobs and businesses, and the empowerment of people to make democracy work. To further these goals, CWA actively seeks Federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8. Members of CWA have a recreational, aesthetic and/or environmental interest in Speedway Brook and Ten Mile River. One or more of such members who reside in the Attleboro area use and enjoy Speedway Brook and Ten Mile River for recreation, sightseeing, wildlife observation and/or other activities in the vicinity of and downstream of Defendant's discharges. These members use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. The interests of CWA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act, as alleged herein. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

9. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and the citizens of the Commonwealth of Massachusetts, for which harm they have no plain, speedy, or adequate remedy at law.

10. Defendant Richline Group is a corporation organized under the laws of the State of Delaware with its principal place of business in New York. Defendant owns the Primary Metals Facilities in Attleboro and operates them under the name "LeachGarner, a Berkshire Hathaway Company."

## STATUTORY BACKGROUND

11.     <u>Pollutant Discharges without a Permit are Illegal</u>.  The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by the Federal Environmental Protection Agency ("EPA") under the National Pollutant Discharge Elimination System ("NPDES").  Sections 301(a), 402(a) and 402(p) of the Act. 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

12.     <u>EPA Has Made Stormwater Discharges from Primary Metals Facilities Subject to the Requirements of EPA's General Industrial Stormwater Permit</u>.  In order to minimize polluted stormwater discharges from industrial facilities, the Federal Environmental Protection Agency has issued a general industrial stormwater permit ("Stormwater Permit").  EPA's Stormwater Permit was first issued in 1995, and was reissued in 2000 and 2008.  See 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008).  Primary metals facilities are subject to the requirements of this Stormwater Permit.  Stormwater Permit, Appendix D, pg. 58-59.

13.     <u>Primary Metals Facilities Must Comply with the Monitoring and Reporting Requirements of the Stormwater Permit</u>.  The Stormwater Permit requires these facilities to, among other things:

  a. ensure that stormwater discharges do not cause or have the reasonable potential to cause or contribute to a violation of water quality standards, Stormwater Permit, pg. 16;

  b. conduct monitoring of stormwater discharges at all Facility outfalls in each of the first four full quarters of permit coverage for compliance with benchmark limitations applicable specifically to primary metals facilities, Stormwater Permit, pp. 36, 58-59;

  c. report all monitoring results for all Facility outfalls to EPA by specified deadlines, Stormwater Permit, pg. 41;

  d. conduct corrective action after the average of 4 quarterly samples exceeds the EPA benchmark value, Stormwater Permit, pp. 18, 36;

    e. conduct routine facility inspections at least quarterly, quarterly visual assessments, and annual comprehensive inspections to, among other things, sample and assess the water quality of the facility's stormwater discharges, ensure that stormwater control measures required by the Permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not, Stormwater Permit, pp. 18-25;

    f. timely prepare and submit to EPA annual reports that include findings from the annual comprehensive site inspections and documentation of corrective actions, Stormwater Permit, pp. 24, 41; and

    g. comply with any additional state requirements, *see* Stormwater Permit, pp. 140-141.

14. <u>Citizens may bring an action to enforce these requirements</u>. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

## STATEMENT OF FACTS

15. Defendant owns and operates facilities at 49 Pearl Street and 200 East Street in Attleboro.

16. Operations at the 49 Pearl Street Facility include the fabrication of metal products such as jewelry and jewelry components and fabrication of metal coatings and engravings.

17. Operations at the 200 East Street Facility include the rolling and drawing of nonferrous metals.

18. During every rain event, rainwater flowing over the Facilities becomes contaminated with pollutants.

19. Stormwater is discharged from the Facilities into the City of Attleboro's municipal storm drain system, which discharges to Speedway Brook, a tributary of Ten Mile River.

20. Control measures taken at the 200 East Street Facility are inadequate to prevent stormwater discharges from exceeding the Permit's benchmark standards for Total Copper and Total Zinc.

21. Control measures taken at the 49 Pearl Street Facility are inadequate to prevent stormwater discharges from exceeding the Permit's benchmark standards for Total Aluminum, Total Iron, Total Zinc, and Nitrate plus Nitrite Nitrogen.

22. Metals such as copper, zinc, aluminum, and iron at excessive concentrations are toxic to fish, aquatic plants, and other aquatic life.

23. Chronic effects of copper include damage to gills, liver, kidneys, and the nervous system of aquatic species. Copper can also interfere with sense of smell, preventing fish from choosing good mates or locating safe mating areas.

24. Elevated concentrations of zinc in water are particularly toxic to species of algae, crustaceans, salmonoids, and other macroinvertebrates.

25. Aluminum can also be highly toxic to aquatic plant species.

26. Dissolved iron is bioavailable and can be toxic to fish and other aquatic life. Iron in the form of solid particulate can settle on the bottom of water bodies and destroy bottom-dwelling invertebrates, plants, or incubating fish eggs. Iron can also cause aesthetically objectionable conditions in water bodies by making the water appear rust colored.

27. Concentrations of these metals can affect the reproductive systems of aquatic life, resulting in severe population declines. Such toxic metals, because of their long biological half-lives, bioaccumulate in organisms over time. They may also be hazardous to human life if they enter the water supply.

## FIRST CAUSE OF ACTION

### Failure to Reduce and/or Eliminate Pollutants to the Extent Achievable:
### Violations of 33 U.S.C. § 1311(a)

28.     Plaintiff re-alleges and incorporates Paragraphs 1-27, inclusive, as if fully set forth herein.

29.     Since at the latest January 7, 2009, control measures implemented at the Facilities have been inadequate to reduce and/or eliminate stormwater pollutants to the extent achievable, using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice. Stormwater Permit, section 2.0 (pg. 12).

30.     Since at the latest June 26, 2010, benchmark monitoring showed that control measures implemented at the Facilities were not "achieving their intended effect of minimizing pollutant discharges" triggering the Permit's requirement for corrective action.  General Permit, sections 2.1, 3.2.  However, adequate corrective action was never taken.  To the extent corrective action was taken at the Facilities following the triggering of this event, such corrective action was inadequate, as evidenced by the persistant exceedence of the benchmarks.

31.     As shown on a Table attached hereto as Exhibit A, LeachGarner's stormwater discharges have been well above EPA benchmark levels since June 26, 2010.  The presence and persistence of these exceedences shows that the company has not complied with its requirement to "modify" its control measures "as expeditiously as practicable" to minimize its pollutant discharges to the extent achievable.

32.     Each of Defendant's violations of the reduction and/or elimination requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued, as set forth on Exhibits B and C hereto.  Alternatively, each of these violations is a separate and distinct violation for each day on which stormwater was discharged from the Facility and on which the failure to reduce and/or eliminate pollutants occurred and/or continued.  To the extent it is determined that rain dates

are relevant in determining the dates of violations, such dates through October 31, 2013 are set forth on Exhibit D.

## SECOND CAUSE OF ACTION
### Failure to Comply with the Monitoring Requirements of the Stormwater Permit: Violations of 33 U.S.C. § 1311(a)

33.     Plaintiff re-alleges and incorporates Paragraphs 1-32, inclusive, as if fully set forth herein.

34.     Defendant has failed to comply with the Stormwater Permit's requirement for monitoring of its stormwater discharges.  Monitoring for compliance with the benchmark limitations was not conducted at either Facility during the following quarters:  April-June 2010, July-September 2010, October-December 2010, January-March 2011, April-June 2011, July-September 2011, October-December 2011, January-March 2012, April-June 2012, July-September 2012, October-December 2012, January-March 2013, and April-June 2013.   [Stormwater Permit, pg. 36, section 6.2.1.2.]

35.     These violations, which are set forth on Exhibit  B and C hereto, establish an ongoing pattern of failure to comply with the Stormwater Permit's monitoring requirements.

36.     Each of Defendant's violations of the monitoring requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the failure to monitor occurred and/or continued.  Alternatively, each of these violations is a separate and distinct violation for each day on which stormwater was discharged from the Facility and on which the violation occurred and/or continued.  To the extent it is determined that rain dates are relevant in determining the dates of violations, such dates through October 31 are set forth on Exhibit D.

## THIRD CAUSE OF ACTION
### Failure to Comply with the Reporting Requirements of the Stormwater Permit: Violations of 33 U.S.C. § 1311(a)

37.     Plaintiff re-alleges and incorporates Paragraphs 1-38 inclusive, as if fully set forth herein.

38.     Defendant has failed to comply with the Stormwater Permit's requirement for reporting benchmark monitoring results to EPA.  Defendant has failed to report to EPA results of benchmark

monitoring it has conducted, if any, within 30 days of receipt of monitoring results, as required by the Stormwater Permit.  Stormwater Permit, [7.1]  Defendant's violations of the Stormwater Permit's reporting requirements are separate and distinct from violations of the Stormwater Permit's monitoring requirements.

39.     These violations, which are set forth on Exhibit B and C hereto, establish an ongoing and continuing pattern of failure to comply with the Stormwater Permit's reporting requirements.

40.     Each of Defendant's violations of the benchmark monitoring reporting requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the failure to report occurred and/or continued.  Alternatively, each of these violations is a separate and distinct violation for each day on which stormwater was discharged from the Facility and on which the violation occurred and/or continued.  To the extent it is determined that rain dates are relevant in determining the dates of violations, such dates through October 31, 2013 are set forth on Exhibit D.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1.     Declare Defendant to have violated and to be in violation of the Act as alleged herein;

2.     Enjoin Defendant from discharging pollutants from the Facility into the wetlands and surface waters surrounding and downstream from the Facility;

3.     Require Defendant to implement the requirements of the Stormwater Permit;

4.     Order Defendant to pay civil penalties of  up to $37,500 per day of violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 74 Fed. Reg. 626, 627 (2009);

5.     Order Defendant to take appropriate actions to restore the quality of navigable waters impaired by their activities;

6.     Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

7.     Award any such other and further relief as this Court may deem appropriate.

Dated: 11/4/2013                                   Respectfully submitted,

                                                   */s/Nora J. Chorover*
                                                   NORA J. CHOROVER (Bar No. 547352)
                                                   Stern, Shapiro, Weissberg & Garin, LLP
                                                   90 Canal Street, 5th Fl.
                                                   Boston, MA  02114
                                                   Phone: 617-742-5800
                                                   Fax:    617-742-5858

                                                   Attorneys for Plaintiff
                                                   CLEAN WATER ACTION

## CLEAN WATER ACTION'S CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure and Massachusetts District Court Local Rule 7.3, Plaintiff Clean Water Action states that it does not have a parent corporation and no publicly held company owns 10% or more of its stock.